**COMMUNITY FOR CREATIVE NON–VIOLENCE, et al.,**
Appellants,

v.

**Samuel R. PIERCE, Jr.,**
**Secretary, H.U.D.**

No. 84–5682.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 5, 1986.

Decided March 13, 1987.

Mark A. Venuti, Washington, D.C., for appellants.

Michael J. Ryan, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth, R. Craig Lawrence and Newman T. Halvorson, Jr., Asst. U.S. Attys., Washington, D.C., were on the brief for appellee.

Before WALD, Chief Judge, MIKVA, Circuit Judge, and LEIGHTON,* Senior District Judge.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

Appellants, three homeless men, seven persons and organizations providing services to the homeless, and six state legislators and local officials concerned with the problem of the homeless, brought this action to challenge "A Report to the Secretary on the Homeless and Emergency Shelters" (the "Report"), issued under the aegis of the Department of Housing and Urban Development ("HUD"), of which appellee Samuel R. Pierce, Jr. serves as Secretary (the "Secretary"). The Report estimates that the number of homeless people in the nation at any one time is substantially less than the figure that had previously been accepted. Appellants charged that the Report is "unprofessional, inaccurate, and intentionally misleading" in that it grossly underestimates the number of homeless in America. Their complaint alleged a battery of constitutional and statutory violations, and prayed for the Report's rescission.

The district court dismissed the complaint, concluding that appellants lacked standing to bring the action and that the preparation and dissemination of the Report did not constitute "agency action" reviewable under the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* (1982) (the "APA"). As to all but one claim, we agree

* Of the United States District Court for the Northern District of Illinois, sitting by designation pursuant to 28 U.S.C. § 294(d).

that appellants lack standing, since they have failed to establish the causation and redressability elements of Article III standing. As to the remaining claim, for which appellants do have standing, we find that they may be entitled to appropriate relief if they can prove their claim. We therefore affirm in part and reverse and remand in part the district court's dismissal of the complaint. In so holding, we do not reach the question of whether promulgation and issuance of the Report constitutes "agency action" reviewable under the APA.

## I. BACKGROUND

### A. *The Report*

HUD's Office of Policy Development and Research prepared the Report to meet the Secretary's request for data and information on homelessness. *See* Report at 1. One of HUD's primary aims was to examine the extent of homelessness nationwide. In HUD's view, "[w]hile claims [had] been made by various groups about the size of the problem, little reliable evidence exist[ed] on this question." Report at 3. Prior to the Report, the accepted working estimate for the number of homeless Americans was approximately two million. This figure originated as a rough estimate pronounced in testimony prepared by appellant Community for Creative Non-Violence ("CCNV") for the House Committee on the District of Columbia in July 1980 and was subsequently reported as a firm figure in a book written by two CCNV members. M.E. Hombs & M. Snyder, *Homeless in America, A Forced March to Nowhere* (Washington, D.C.1982). The same figure emerged from the December 1982 congressional hearings on homelessness in America and was released by the Department of Health and Human Services ("HHS") in November 1983. *See* Report at 8–9. The HUD Report, however, repudiates these figures: the Report, heralded by HUD as the "definitive" and first accurate study on the subject, states that 250,000 to 350,000 Americans are homeless.

According to its introduction, the Report "is not intended to serve as a prescriptive policy analysis of what should be done, nor as an evaluation of what has been done. Rather, it is to provide as much comprehensive and reliable information as possible in order to inform policy discussion." Report at 3–4. In releasing its findings in May, 1984, HUD invited public and private officials to use the Report in their efforts to address the needs of the homeless. But no policymaker is required to act in reliance upon the Report; the Report itself has no direct effect on any governmental programs for the allocation or distribution of benefits to the homeless; the Report, in sum, is not an operative document.

Service providers and advocates for the homeless denounced the Report's representation of the extent of homelessness in America. They sought to discredit HUD's findings as improperly researched, unsubstantiated, and inaccurate. They also charged that HUD's conclusion was specifically designed to curtail support for increased federal initiatives and to reduce pressure on the government to respond to the problem on a federal level. CCNV approached HUD informally to request it to withdraw the Report. The Secretary declined, and this lawsuit ensued.

### B. *District Court Proceedings*

In June 1984, appellants filed suit in the United States District Court for the District of Columbia. At the same time, they filed a Motion for Preliminary Injunction. The suit charged HUD with five substantive violations. The first four counts pertained to the procedures used in preparing the Report and to the conclusions drawn from the study; the fifth count set out a defamation claim brought on behalf of CCNV. In their first count, appellants alleged that HUD violated the fifth amendment of the Constitution and sections 552 and 553 of the APA by not following the procedural safeguards incident to a rulemaking. Second, appellants alleged that appellee's actions were "arbitrary" and "capricious" in preparing and issuing a Report that is "inaccurate," "misleading," "unprofessional," and "dishonest." Third, appellants averred that in preparing the Report and publicizing its finding, appellee

used an advisory committee but did not follow the requirements of the Federal Advisory Committee Act, 5 U.S.C.App. § 1 *et seq.* (1982 & Supp.III 1985). That Act requires that notice of the formation of an agency advisory committee be published in the Federal Register, that its activities be open to the public, and that a record of its proceedings and recommendations be kept. In their fourth count, appellants accused HUD of violating the civil rights of the homeless by "defin[ing] them out of existence without giving them an opportunity to be heard or defend their rights and interests." Finally, appellants claimed that HUD "specifically defamed and damaged plaintiff CCNV" in the Report and subsequent remarks. Appellants sought a judgment declaring the Report unlawful and an injunction ordering HUD to disavow and rescind it.

In response to appellants' complaint and motion for preliminary injunction, appellee filed a Motion to Dismiss pursuant to Fed. R.Civ.P. 12(b)(1) and (6) for lack of subject matter jurisdiction or, in the alternative, for failure to state a claim upon which relief can be granted. By Memorandum Order filed September 4, 1984, the district court granted appellee's motion and dismissed the complaint. The court found that appellants lacked standing in that they had failed to allege facts suggesting a substantial likelihood that rescission of the Report would redress their asserted injuries. The court further held that, assuming *arguendo* appellants had standing, the Report did not constitute judicially reviewable "agency action" within the meaning of the APA.

## II. DISCUSSION

### A. *Standing*

The "case or controversy" requirement of Article III of the Constitution imposes limitations on the persons who have "standing" to invoke the jurisdictional power of the federal courts. *See Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984); *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975). The standing doctrine

is designed to confine the courts to adjudicating actual "cases" and "controversies" by ensuring that the complaining party has a concrete interest in the issue and that "the legal question presented to the court will be resolved ... in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). Supreme Court precedent instructs that in order to satisfy the constitutionally imposed standing requirement, a plaintiff must establish at least three elements.

> [A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show [1] that he personally has suffered some actual or threatened injury," ... and [2] that the injury "fairly can be traced to the challenged action" and [3] "is likely to be redressed by a favorable decision."

*Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758 (citations omitted); *see Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 105 S.Ct. 2965, 2971, 86 L.Ed.2d 628 (1985). For appellants to establish standing in this case, therefore, they must allege (1) an injury that is (2) fairly traceable to the HUD Report and (3) likely to be redressed by a judicial decision rescinding the Report. *See Action Alliance of Senior Citizens v. Heckler,* 789 F.2d 931, 936 (D.C.Cir.1986); *Von Aulock v. Smith,* 720 F.2d 176, 180 (D.C.Cir.1983).

For purposes of our decision, we must accept as true all material allegations and construe the complaint in favor of appellants. *Warth v. Seldin,* 422 U.S. at 501, 95 S.Ct. at 2206. We should also consider the affidavits and exhibits submitted by appellants in connection with the motions. *See Center for Auto Safety v. Tiemann,* 414 F.Supp. 215, 219 (D.C.C.1976), *rev'd on other grounds,* 580 F.2d 689 (D.C.Cir.1978); *see also Warth v. Seldin,* 422 U.S. at 501–02, 95 S.Ct. at 2206–07. As to each issue raised by appellants, it will suffice to maintain the suit if the record shows that any one of the appellants has standing. *See,*

*e.g., Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 264 n. 9, 97 S.Ct. 555, 562 n. 9, 50 L.Ed.2d 450 (1977).

Appellant CCNV's defamation claim is different from, and largely unrelated to, the other four claims raised in the complaint; we will discuss it separately below. In the discussion that follows, we address appellants' standing to challenge HUD's procedures in preparing and issuing the Report, the subject of the first four counts of the complaint. In this regard, appellants allege that they have been threatened with injury from HUD's unwarranted reduction in the number of homeless people. Appellants fear that legislators, administrators, and private benefactors will believe the Report and consequently will make decisions that deprive appellants of resources adequate to the true dimensions of the problems of the homeless. We find on these pleadings that, although appellants have asserted judicially cognizable injury, they have failed to satisfy the second and third constitutionally imposed elements of standing—causation and redressability.

### 1. *Injury-in-Fact*

The first constitutional element of the standing doctrine, injury-in-fact, requires the plaintiff to allege facts demonstrating a definable and discernible injury and an adequate connection between that injury and himself. *See United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 688–89, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973); *Community Nutrition Institute v. Block,* 698 F.2d 1239, 1246 (D.C.Cir.1983), *rev'd on other grounds,* 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984). This requirement serves to ensure that the plaintiff has "such a personal, direct stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of the issues" *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1961). Plaintiffs who allege injury that meets the constitutional requirement necessarily fulfill the APA's standing requirement to challenge agency action—plaintiffs must be "adversely af-

fected" or "aggrieved." 5 U.S.C. § 702 (1982); *see Clarke v. Securities Industries Association,* — U.S. —, —, 107 S.Ct. 750, 755, 93 L.Ed.2d 757 (1987); *Public Citizen v. Lockheed Aircraft Corp.,* 565 F.2d 708, 716 (D.C.Cir.1977); *see also SCRAP,* 412 U.S. at 687–90, 93 S.Ct. at 2415–17. The district court did not address this element of standing, but we find that, with the exception of the government officials, appellants have made allegations of injury sufficient to support standing in this case as to each of their four claims.

■ The Secretary asserts that none of the three groups of appellants has alleged injury-in-fact but focuses his attack on the homeless men. Appellee argues that there is no allegation that these appellants will be personally and actually affected. The Secretary is mistaken. The three homeless men, who sue on behalf of themselves and those similarly situated, allege that they are being and will be denied their needs as a result of the HUD Report. The homeless men have thus alleged injury to themselves of a very concrete and personal nature: being turned away from shelter, forced to sleep on the street, and deprived of food and clothing. It is difficult to imagine being more "adversely affected" or "aggrieved." *See* 5 U.S.C. § 702. Furthermore, it is sufficient to provide standing that the ultimate harm alleged is a threatened harm rather than an accomplished fact. *See Los Angeles v. Lyons,* 461 U.S. 95, 101–02, 103 S.Ct. 1660, 1664–65, 75 L.Ed.2d 675 (1983); *SCRAP,* 412 U.S. at 688–89, 93 S.Ct. at 2416–17.

■ The second group of appellants— service providers and advocates for the homeless who sue on their own behalf and, in the case of organizations, on behalf of their members—have also alleged harm sufficient to confer standing. This group seeks to raise awareness of the homelessness problem and to care for those who are homeless. They are totally dependent on private and public donations of time, money, goods and services. HUD argues that these appellants have alleged an "abstract concern" with the subject of the plight of

the homeless which "does not substitute for the concrete injury received by Art. III." *See Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 40, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976). But the organizations allege injury that meets the constitutional standard of concreteness: HUD's actions will "make it impossible to secure resources for ... homeless that would be in line with the existing and proven level of need." Appellants rest this claim on programmatic concerns, not on political or social interest in the agency's actions. Their complaint identifies concrete organizational interests detrimentally affected by HUD's actions— curtailment of the opportunity for funding and assistance. If their allegations are true, as we must assume, the organizations have been actually and concretely injured. *Cf. Action Alliance of Senior Citizens,* 789 F.2d at 937 (holding that an organization that served senior citizens has standing to challenge HHS regulation that affected its programs).

■ The third group of appellants, elected and appointed state and local officials, have not alleged injury sufficient to meet the constitutional minimum. Although the pleadings are somewhat convoluted on this point, these appellants appear to allege two injuries; both stem from the allegation that, in shaping their own policies for the homeless, the officials rely on the "accuracy and integrity of the information on which Congress relies." First, the officials allege that because the Report is inaccurate but reports to be definitive, it will cause confusion among legislators. Second, they claim that the Report's invitation to use information that is misleading and biased "represents an unwarranted and illegitimate intrusion by the federal government into State legislative processes." We find that these allegations of confusion and intrusion are simply too abstract to be judicially cognizable. *Cf. Lyons,* 461 U.S. at 101, 103 S.Ct. at 1664 ("Abstract injury is not enough."). The failure of these appellants to satisfy the first constitutional condition of standing, however, does not preclude appellants as a whole from pursuing their action against the Secretary. *See*

*Village of Arlington Heights,* 429 U.S. at 264 n. 9, 97 S.Ct. at 562 n. 9. We therefore must turn to the second and third constitutional elements of the standing doctrine.

2. *Causation*

A party injured in fact may nevertheless lack standing if the challenged action did not cause the injury. *See Simon,* 426 U.S. at 40–46, 96 S.Ct. at 1925–28; *California Association of the Physically Handicapped v. FCC,* 778 F.2d 823, 825–27 (D.C. Cir.1985). In order to satisfy the causation element of standing, the plaintiff must show that the alleged injury " 'fairly can be traced to the challenged action.' " *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758 (quoting *Simon,* 426 U.S. at 41, 96 S.Ct. at 1925); *see Warth v. Seldin,* 422 U.S. at 507, 95 S.Ct. at 2209. Thus, the causation requirement, as applied to the injury in this case, demands that the curtailment of opportunities for funding and aid for the homeless be fairly traceable to HUD's promulgation and dissemination of the Report. Appellants assert that there is necessarily a causal connection. We cannot agree. There is not a legally sufficient connection between the alleged injury and the challenged agency action. In our view, "[t]he links in the chain of causation ... are far too weak for the chain as a whole to sustain [appellants'] standing," *Allen v. Wright,* 468 U.S. at 759, 104 S.Ct. at 3328.

■ The primary source of appellants' injury is the future response of others to the Report's findings. Appellants seek "to change [appellee's] behavior *only as a means* to alter the conduct of third part[ies], not before the court, who [are] the direct source of [appellant's] injury." *Common Cause v. Department of Energy,* 702 F.2d 245, 251 (D.C.Cir.1983) (emphasis in original). We recognize that "[t]he mere fact that ultimate relief to the appellants depends on the actions of third parties does not by itself defeat appellants' standing, ... [although it] 'may make it substantially more difficult to meet the minimum requirement of Article III'...." *Von Aulock,* 720 F.2d at 181 (citations omitted); *see Simon,* 426 U.S. at 61–62, 96 S.Ct. at

1935 (Brennan, J., concurring); *Block v. Meese*, 793 F.2d 1303, 1309 (D.C.Cir.1986). Nevertheless, third party causation cases from the Supreme Court and this court teach that appellants must show that the agency's action is more than only one of the many factors whose relative influence may affect the third parties' behavior. *See, e.g., Simon*, 426 U.S. at 42–44, 96 S.Ct. at 1926–27; *Committee for Monetary Reform v. Board of Governors of the Federal Reserve System*, 766 F.2d 538, 542 (D.C. Cir.1985). The facts alleged must show that the agency action is at least a substantial factor motivating the third parties' actions against appellants.

In their complaint, appellants assert that "by 'officially' reducing the working estimate of the problem of homelessness in America to between 250,000 and 350,000 on any given night of the year, HUD, with the imprimatur of the United States government, guarantees the further diminution of already inadequate resources." From appellants' pleadings, declarations, and briefs, we gather that appellants posit the following line of causation. As a result of failing to follow proper procedures under the APA, utilizing faulty methodology, and deliberately overlooking available data, the Report wrongly minimizes the number of homeless Americans. Those involved in addressing the problem of the homeless will read the Report. They will be convinced that its findings and conclusions are accurate and definitive, and they will disregard other estimations that are significantly higher. This, in turn, will alter their consciousness about homelessness: they will no longer perceive homelessness as a severe and pressing problem (or at least they will view it to be less acute). This decrease in sensitivity will inevitably cause them to reduce their contributions of time, money and resources to support the homeless.

The line of causation that we are asked to follow is far too attenuated to sustain appellants' standing. We cannot find that appellants have alleged facts indicating that the HUD Report will be a "substantial factor" in any future diminution of support for the homeless. Appellants ask us to assume that readers will find the Report credible after it has been so vigorously challenged, particularly in this very lawsuit. This assumption alone strains credulity. But even assuming readers do credit the Report, in reality the decisions of legislators, administrators, and private benefactors may turn on any number of factors that are totally unrelated to appellee's alleged abuses. State and local perceived needs, political and social pressures, tax incentives or disincentives, public attention (particularly as focused through the media), federal administrative goals, and individual programmatic concerns of religious and civic groups are just a few examples of the many forces operating on various supporters of the homeless. In light of this variety of factors, it is entirely speculative whether HUD's promulgation and dissemination of the Report will be in any way responsible for others' anticipated reduction in contributions. Appellants' bare allegation of causation is inadequate to meet the constitutional requirement that parties allege specific facts sufficient to establish that their injuries are fairly traceable to the alleged violations. The problem of standing becomes even more difficult when appellants have to climb the final hurdle which tracks the relief sought and available even if they survive the other obstacles.

### 3. *Redressability*

The final element of Article III standing is fulfilled if appellants establish that their alleged injury " 'is likely to be redressed by a favorable decision.' " *Valley Forge*, 454 U.S. at 472, 102 S.Ct. at 758 (quoting *Simon*, 426 U.S. at 41, 96 S.Ct. at 1925). This requirement directs this court to assess the likely effect on supporters of the homeless (and on the homeless) of a judicially ordered rescission of the Report. Contrary to appellants' assertion, satisfying this aspect of the standing inquiry entails more than simply alleging facts that indicate that "the withdrawal and rescission of the report will make a difference" because it will remove one influence possibly motivating third parties' injurious actions. *See Greater Tampa Chamber of*

*Commerce v. Goldschmidt*, 627 F.2d 258, 264–65 (D.C.Cir.1980). The Supreme Court has explicitly interpreted the standard for redressability as "substantial likelihood." *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 75 n. 20, 98 S.Ct. 2620, 2631 n. 20, 57 L.Ed.2d 595 (1978); *see Greater Tampa*, 627 F.2d at 265. We agree with the district court that appellants have failed to allege facts showing that the remedy sought is substantially likely to redress their alleged injuries.

It is difficult to imagine a scenario in which a plaintiff who has failed to establish the requisite causation could nonetheless demonstrate sufficient redressability. *Cf. Simon*, 426 U.S. at 45–46, 96 S.Ct. at 1927–28 (concluding without explanation that appellants had not alleged redressability after analyzing at length their failure to allege causation). As this court has noted, the two inquiries are closely related in the present context, because both inquiries require an assessment of how third parties will respond to the agency's action. *See Von Aulock*, 720 F.2d at 180–81. Having failed to establish that the anticipated reduction in public funding and private charity is fairly traceable to the promulgation and dissemination of the Report, appellants face, in our view, an insurmountable barrier in attempting to establish that withdrawal of the Report would be effective to avoid the injury that they foresee.

We cannot perceive a substantial likelihood that the injury complained of will be redressed were we to grant the requested relief. There are simply too many other influences acting on the third parties' decisions. *Cf. Physicians' Education Network, Inc. v. Department of Health, Education, and Welfare*, 653 F.2d 621, 627 (D.C.Cir.1981) (holding in a very similar context that plaintiff had failed to establish redressability because it could not show that defendant's actions were a substantial influence on the offending third parties). Appellants have offered nothing more than speculation to support the conclusion that a judicially-ordered rescission of the Report is substantially likely to prevent public and private parties from reducing the amount of aid they contribute to the caring of the homeless. "[U]nadorned speculation will not suffice to invoke the federal judicial power." *Simon*, 426 U.S. at 44, 96 S.Ct. at 1927.

### B. *Appellants' Defamation Claim*

■ As noted earlier, appellants charge appellee with defaming appellant CCNV in the Report and in statements made by officials of HUD after the Report's issuance. Specifically, appellants allege that CCNV was "in large part responsible for the realistic figure of two million homeless Americans"; that the Report "states that this figure has no basis and that no definitive national study has been done"; and that appellee subsequently referred to the figure as "a complete fabrication." Appellants further allege that "[t]hese statements are wrong and baseless and a deliberate attempt to damage CCNV's reputation and [efforts]," and that the statements have so damaged CCNV. In dismissing the entire complaint for lack of standing, the district court did not address the sufficiency of these allegations. To the extent the court implicitly concluded that appellants lack standing to pursue their tort claim, the court was incorrect. These allegations clearly confer standing upon CCNV.

Reviewing appellants' defamation on the merits, we nevertheless find that the district court correctly dismissed that portion of the claim dealing with libel. CCNV's defamation claim consists of two separate claims: one for libel and one for slander. In order to make out a cause of action for libel or slander, a plaintiff must demonstrate that defendant's remarks are "defamatory." Under District of Columbia law "a publication is considered defamatory 'if it tends to injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community.' " *Olinger v. American Savings & Loan Association*, 409 F.2d 142, 144 (D.C.Cir.1969) (quoting *Afro-American Publishing Co. v. Jaffe*, 366 F.2d 649, 654 (D.C.Cir.1966) (en banc)); *see Smith v. District of Columbia*, 399 A.2d 213, 220 (D.C. App.1979) (using identical language to de-

scribe when an oral communication is defamatory and citing *Olinger, supra* ). In addition, the statement must be "more than merely unpleasant or offensive but [must] make the plaintiff appear 'odious, infamous, or ridiculous.' " *McBride v. Merrell Dow and Pharmaceuticals Inc.*, 717 F.2d 1460, 1463 (D.C.Cir.1983) (quoting *Johnson v. Johnson Publishing Co.*, 271 A.2d 696, 697 (D.C.App.1970)). In a defamation case, it is the role of the court to determine whether the challenged statement is "capable of bearing a particular meaning" and whether "that meaning is defamatory." *Restatement (Second) of Torts* § 614(i) at 311 (1977); *see McBride*, 717 F.2d at 1463.

In the libel portion of their complaint, appellants allege generally that the Report's comments regarding CCNV are defamatory. Essentially, appellants allege that the Report suggests that the two million figure is "baseless" and therefore implies that CCNV's estimate is fraudulent and imputes dishonesty to CCNV. Courts generally accept that an imputation of dishonesty or fraud is defamatory. *See, e.g., Hoffman v. Washington Post Co.*, 433 F.Supp. 600 (D.D.C.1977), *aff'd*, 578 F.2d 442 (D.C.Cir.1978). Thus, we must determine if the Report can possibly be construed as CCNV alleges.

The Report itself belies appellants' construction. The Report begins the discussion of the extent of homelessness in America by stating that "[n]o one has done a thorough census of the homeless population in the United States." Report at 8. It goes on to report that "some observers have claimed that the national total is as high as two or three million persons." Report at 8. It explains that this "estimate" originated in testimony by CCNV before the House Committee, although it notes that CCNV never actually reported a precise figure to Congress. Report at 9. The Report then quotes from the CCNV members' book in which the authors explain how CCNV arrived at the 2.2 million figure. The Report never mentions CCNV again and in fact never mentions the two million figure again. Declaring that "[t]here is a clear need for more systematic evidence to help in assessing existing esti-

mates[,]" Report at 9, the Report proceeds to lay out the four approaches used by HUD to assess the size of the homeless population and concludes with the agency's determination of "the most reliable range" of figures, Report at 9–18.

■ For purposes of our inquiry, the Report "must be taken as a whole, and in the sense which it would be understood by the readers to whom it was addressed." *Jaffe*, 366 F.2d at 655. At most, a reader might conclude that CCNV's figure is grossly overestimated, is not the result of "a thorough census," and was not drawn from equally "systematic evidence." But a suggestion of inaccuracy and of utilizing inadequate research is not defamatory. We cannot conclude that a reader of average interest could reasonably understand the Report to signify that CCNV's figures are fraudulent or dishonest. Because we find that nothing in the Report is capable of bearing a defamatory meaning, we dismiss appellants' libel claim for failure to state a claim upon which relief may be granted.

■ The second set of allegedly defamatory remarks, pertaining to CCNV's slander claim, does not suffer from this insufficiency. As particularized in the CCNV declaration submitted in support of appellee's Motion for a Preliminary Injunction, these allegedly slanderous statements consist of two separate oral communications. The first is a comment made by the Secretary on "Nightline" stating that the two million figure "is absolutely ridiculous" and that CCNV "grabbed the one percent [2.2 million] out of the air." HUD's Acting General Deputy Assistant Secretary for Policy, Development, and Research, Benjamin Bobo, made the second comment during the May 24 congressional hearing. Assistant Secretary Bobo testified that by "check[ing] with Mr. Snyder [CCNV member] to determine the basis of [the two million figure], ... [i]t turned out that there was no legitimate or systematic basis or basis for the figure...." An observer could reasonably understand these comments as allegations that CCNV intention-

ally fabricated the two million figure out of whole cloth. Such an imputation of fraud and dishonesty in one's professional dealings is defamatory. *See Hoffman, supra.* Since it is not beyond doubt that a reasonable person might understand the comments as conveying defamatory falsehoods, we cannot sanction the complaint's dismissal on this count. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). We do not, of course, suggest that CCNV has actually been defamed. That issue must be resolved before the trial court.

■ The nature of the remedy that appellants seek, however, gives us pause. The sole relief appellants request is a judgment declaring the Report unlawful and an injunction ordering HUD to disavow and rescind it. The remedy sought here bears no relationship to the harm allegedly caused by the slander. Even assuming the HUD officials tortiously defamed CCNV, HUD's rescission and renunciation of the Report will do nothing to relieve the alleged damage to CCNV's reputation caused by the Secretary's and Mr. Bobo's remarks. We are mindful, however, that a court should not dismiss a complaint on grounds that the relief prayed for is inappropriate, so long as plaintiffs may be entitled to some relief if they are able to prove their claims. *See Norwalk Core v. Norwalk Redevelopment Agency,* 395 F.2d 920, 925–26 (2d Cir.1968); *Deary v. Guardian Loan Co.,* 563 F.Supp. 264, 265–66 (S.D.N.Y. 1983).

On the record before us, we are unable to find that CCNV would not be entitled to appropriate relief, although appellant faces considerable impediments to recovery. Appellants must thus be given an opportunity to seek such relief, amending their complaint if necessary to that effect. Both equitable and monetary relief may be appropriate.

■ If able to prove its slander claim, CCNV may be entitled to alternative equitable relief, *e.g.,* a retraction. The usual rule is "that equity does not enjoin a libel or slander and that the only remedy for defamation is an action for damages." *Ku-*

*katush Mining Corp. v. SEC,* 198 F.Supp. 508, 510–11 (D.D.C.1961) (dismissing slander claim that prayed for injunctive relief), *aff'd,* 309 F.2d 647 (D.C.Cir.1962); *see Leo Winter Associates, Inc. v. Department of Health and Human Services,* 497 F.Supp. 429 (D.D.C.1980). However, "[u]nder certain circumstances, declaratory and injunctive relief may be obtained against defamatory statements by government officials." *Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Institution,* 566 F.2d 289, 294 n. 16 (D.C.Cir.1977) (en banc) (citing *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 139–40, 71 S.Ct. 624, 631–32, 95 L.Ed. 817 (1951)), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978). Because the parties paid little, if any, attention to this claim either here or before the district court, there is insufficient information to enable us to determine whether those circumstances apply in this case.

Alternatively, if able to prove its slander claim, CCNV may be entitled to damages. But appellant would have to assume a substantial burden, both evidentiary and legal. In order to recover against the Secretary, CCNV must demonstrate that the traditional damage remedy is not foreclosed because of the doctrine of official immunity. Federal government employees enjoy immunity from liability in damages for common law defamation if they act within "the outer perimeters" of their official authority. *See Schewmaker v. Minchew,* 666 F.2d 616, 617 (D.C.Cir.1981); *Expeditions Unlimited Aquatic Enterprises,* 566 F.2d at 291; *see also Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959). Given the Secretary's broad statutory duties, *see* 42 U.S.C. § 3523 (1982), the Secretary's comments may fall within the outer perimeters of his authority. *Cf. Barr v. Matteo,* 412 U.S. at 575, 79 S.Ct. at 1341 ("It would be an unduly restrictive view of the scope of the duties of a policy-making executive official to hold that a public statement of agency policy in respect to matters of wide public interest and concern is not action in the line of authority."). Again, given the dearth of information on point

and the absence of a complaint that seeks monetary relief, we are unable to resolve the issue of the Secretary's immunity.

Both forms of relief, equitable and monetary, may be foreclosed against Assistant Secretary Bobo. Appellants have not named Mr. Bobo as a defendant and have offered no theory on which the Secretary, the named defendant, might be held liable for Mr. Bobo's tortious behavior. This oversight may preclude recovery for the Assistant Secretary's allegedly slanderous statements. Moreover, because Mr. Bobo made his remarks before the House during public hearings, his communications may be subject to the common law privilege applicable to legislative proceedings. *See Webster v. Sun Co.*, 731 F.2d 1 (D.C.Cir. 1984) (holding that legislative privilege depends upon whether statements were solicited or not, and setting out definition of privilege in context of unsolicited remarks); Restatement (Second) of Torts §§ 588, 590A (1977). Neither party has broached this issue, and the lack of information renders this court ill-equipped to address it.

Despite our serious reservations about appellant's ability to overcome the obstacles enumerated above, we cannot say, based on the pleadings and declarations before us, that CCNV is not entitled to some form of appropriate relief if it is able to prove its slander claim. Accordingly, we reverse the district court's dismissal of this portion of the complaint and remand to the court for further disposition of this claim.

### CONCLUSION

Homelessness in America is a serious and growing problem of national proportion. These often shunned and forgotten members of society must rely on private sector contributions and government largess for their very subsistence. Resources and services available to them depend on current sympathetic sentiment which can be characterized as fragile, at best. Appellants' efforts to address the needs of the homeless and their unflagging commitment to their cause are a significant factor in managing this difficult societal problem. We can appreciate appellants' distress with what they perceive to be HUD's underestimation of the number of homeless and trivialization of their plight; appellants' fear that the HUD Report may impair their ability to obtain necessary resources is not entirely without basis.

The courts, however, do not provide the proper forum in which appellants may mount the majority of their challenges to the contents of the HUD Report. As to all but the defamation claim, the line of causation between appellee's alleged illegal conduct and appellants' asserted injury is too attenuated and the prospect of obtaining relief from the injury as a result of a favorable ruling is too speculative to warrant this court's exercise of power under Article III. The district court correctly held that appellants lack standing to prosecute these claims.

Appellant CCNV has established standing to prosecute its defamation claim. But it has failed to demonstrate that the Report might be found defamatory, and we thus agree with the district court that the libel portion of CCNV's defamation claim warrants dismissal. On the record before us, however, we are unable to approve the district court's dismissal of CCNV's slander claim. Although the relief appellants sought in their complaint is inappropriate, we cannot find that CCNV would not, as a matter of law, be entitled to amend and seek appropriate relief.

The opinion of the district court dismissing appellants' complaint is therefore reversed in part and remanded to allow appellants to proceed with their slander claim if they seek appropriate relief. In all other respects the opinion is affirmed.

*It is so ordered.*